**Gary GRANOFF, individually and doing business as Granoff Resources, Plaintiffs,**

v.

**MERRILL LYNCH & CO., INC., Merrill, Lynch, Pierce, Fenner & Smith, Inc., the Growth & Guaranty Fund L.P., Merrill Lynch Options/Futures Management, Inc., and Merrill Lynch Futures, Inc., Defendants.**

No. 89 Civ. 0159 (RPP).

United States District Court, S.D. New York.

Sept. 30, 1991.

Wolf Popper Ross Wolf & Jones by Michael P. Fuchs, New York City, for plaintiffs.

Schulte Roth & Zabel by Catherine Samuels, Glenn E. Butash, New York City, for defendants.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

Defendants move pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment on plaintiff's three claims for relief in this diversity action alleging breach of contract, misappropriation of plaintiff's idea for a financial product, and fraud and misrepresentation. The Court denied the defendants' first motion for summary judgment without prejudice, by memorandum of October 11, 1989, on the ground that sufficient discovery had not yet taken place. No. 89 Civ. 0159, 1989 WL 260227, 1989 U.S.Dist. LEXIS 12173. Since that denial, exhaustive discovery of the facts pertaining to liability has been completed and the motion for summary judgment has been renewed. Defendants claim that there is no genuine issue of fact on two issues which are dispositive of all three claims: (1) that plaintiff's idea was not novel, and (2) that the financial product of defendant was developed independently of plaintiff, without misappropriation, use or knowledge of his idea.

For purposes of this motion, the following facts alleged by plaintiff and defendants are undisputed.

## BACKGROUND

I.  Granoff's Contact with Merrill Lynch

Plaintiff Gary Granoff ("Granoff") claims that he approached defendants (collectively, "Merrill Lynch") in 1986 with an idea for a financial product called "Portfolio Protection Insurance." He claims that his conception of the idea was based on his experience as an insurance actuary, his study of financial products used in business, and his experience managing his own investment portfolio of "several tens of thousands of dollars." Deposition of Gary Granoff of February 1, 1991 ("Granoff Dep.") at 200. With the assistance of his Merrill Lynch broker in Florida, Granoff was able to set up a meeting with two Merrill Lynch employees in New York, Michael J. Galbreath ("Galbreath") and Kenneth J. Nixon ("Nixon"). Galbreath was then employed in Merrill Lynch's Capital Markets Group and Nixon was a tax lawyer in its legal department. Before the meeting, Granoff sent Galbreath a letter dated June 13, 1986, in which he suggested a letter agreement to safeguard the confidentiality of his proposal and stated he would be available to meet on July 1, 2 or

3, 1986. Exhibit C to Affidavit of Gary Granoff sworn to February 1, 1991 ("Granoff Aff.").

Although Granoff states that the meeting took place on June 30, 1986 and Galbreath states that it took place on July 1, 1986, it is undisputed that, at the meeting, Galbreath gave Granoff a letter dated June 30, 1986, based on the draft letter agreement Granoff had sent Galbreath earlier. In the letter, Galbreath, on behalf of Merrill Lynch, agreed to keep confidential their discussions and any written materials provided by Granoff and agreed to decide, on or before September 1, 1986, whether Merrill Lynch would pursue Granoff's idea. The letter also recited that if Merrill Lynch decided to pursue the proposal, it would not take further action before entering into a formal agreement with Granoff. Exhibit D to Granoff Aff.

At the meeting, Granoff gave Galbreath and Nixon a written proposal and discussed his idea with them. As more fully described therein, the proposal was that Merrill Lynch offer to its customers a partial guarantee against losses in their security portfolios. Galbreath and Nixon state he gave them two type-written pages which describe a proposal titled "Portfolio Protection Insurance" ("PPI"). Exhibit B to Granoff Aff. Granoff states he gave them those pages and four more pages which he took from a proposal which he had originally submitted to Marsh & McLennan in 1984. Exhibits B and E to Granoff Aff. After reviewing the Granoff proposal, Nixon sent a memo to Galbreath, to which the two-page proposal was attached, analyzing the idea and questioning its feasibility and novelty. Exhibit F to Granoff Aff. Among Nixon's concerns was that securities brokers/dealers who are not subject to regulation by state insurance departments generally are not authorized to issue what might be defined as insurance contracts or policies. Deposition of Kenneth J. Nixon of December 20, 1989 ("Nixon Dep.") at 89.

Granoff states that after the meeting, he called Galbreath several times to discuss the proposal and was repeatedly told that Merrill Lynch was still reviewing the idea for possible implementation and had not yet made a decision. Galbreath informed Granoff during mid-August 1986 that Merrill Lynch had decided not to pursue his proposal.

II. Development of the Growth and Guarantee Fund

In June, 1987, Merrill Lynch published a prospectus offering a fund called the Growth and Guarantee Fund ("the Fund"), which Granoff claims was based upon the proposal he submitted to Merrill Lynch. Defendants offer unrebutted affidavits which show that the Fund was created as a result of several years of work by Merrill Lynch employees based on a concept first outlined in a report issued in 1984. It was then described internally as the "Price Guarantee Program" ("PGP") and was the project of a Merrill Lynch Task Force on derivative products (the "Task Force"). As described in an internal Merrill Lynch document, the May 1984 Task Force Report, the PGP was originally conceived as a means of providing the retail customer with protection against investment risk. Exhibit S to Granoff Aff. The May 1984 Task Force Report entitled "Derivative Products Strategy"[1] described its contemporaneous concept of its proposed PGP as follows:

*Program Description:* Provide customer, who is interested in a given stock (or other financial instrument or portfolio of instruments) but wants to limit his down side risk, a method to limit his potential losses by paying a premium to insure against losses larger than those which he is willing to tolerate. This program may be used by either a customer who is about to purchase the instrument, or one who is currently holding the instrument. The customer determines which stock he wants to hedge, how much loss in price

---

**1.** During the early 1980s, "program trading," the use of computer programs to execute trades automatically upon the occurrence of certain events, came into increasing use on Wall Street.

In 1982, stock index futures were introduced, giving rise to the possibility of Derivative Products. Deposition of Carmine Grigoli of September 14, 1990 ("Grigoli Dep.") at 9.

he is willing to tolerate (possible minimum: 10%) and for what number of months he wants a guarantee. The AE keys this information into his terminal and instantly receives a firm quote (possibly expressed as a % of the value of the security). If the quote is acceptable to the customer, the AE handles like [sic] any other order.

*Pricing:* Based on a model that includes both market and instrument outlook, Merrill Lynch would provide customer with a "Guarantee Premium" grid according to time (in months) and percent at risk.

*   *   *   *   *   *

*Additional Comments:* Limits for eligibility, time, types of instruments covered would have to be defined.

Appropriate model would have to be developed and fully tested.

Merrill Lynch would use the derivative products to hedge its position in the guarantee program, yet provide both the AE and customer a *simple* "risk alleviation" program, and thus help satisfy this definite need in the market place. *The use of Derivative Products will help make this a viable, attractive, profitable program for Merrill Lynch, yet the derivative products, per se, need not be understood by either the AE or the customer in order to satisfy their needs.* (emphasis in original).[2]

Exhibit S to Granoff Aff. A later report, dated May 14, 1985, contains specific examples of what would happen to a customer's holdings under the proposed PGP. Exhibit U to Granoff Aff. One example is a situation where a client buys 100 shares of blue chip stock at $100. The client also buys a "unit of protection for 3 months assuring client of nothing more than a 15% stock decline to a price of 85 during that period." *Id.* The example envisions a scenario in which the stock price falls below 85 during the three-month period and stays there.

Merrill Lynch would "take over" the stock at 85; the client's account would be credited with $8500. Merrill Lynch would attempt to lock in a price level of 85 to control its own loss on the stock. It would do this by hedging with equivalent stock index futures "so that a further decline in the price of the stock below 85 would result in a corresponding gain in the value of the futures." *Id.* The May 14, 1985 report describes the specific action to be taken as follows:

As soon as a stock hits the price of 85, the overall ML hedge position (possibly comprised of stock index futures short positions, short sales of stock and synthetic shorts using options) is increased in an amount commensurate with the volatility and assessed risk factor of the stock at that market level. The overall hedge position is continually managed.

*Id.* The comments attached to the May 14, 1985 report note the relative ease of hedging stocks which correlate well with the Standard and Poor's 500 and can be shorted easily and are optionable, and it notes the difficulty of controlling the hedge risk for more volatile stocks. The comments also state that as envisioned, "[t]here is the possibility that we could pay a client the dollar difference at the end of 3 months between the price of the stock then and a price of 85." *Id.*

In spring of 1986, after two years of research and feasibility studies, Merrill Lynch decided its exposure to risk would be too great under the plan as envisioned and that the transaction costs might outweigh its benefits such that it would not be an attractive product.[3] The Task Force therefore began to explore other means of achieving the same goals without incurring those problems.

On the last weekend in June 1986, Carmine Grigoli, a Merrill Lynch employee who was a member of the Task Force, met with John O'Brien, an expert in "portfolio

---

**2.** "AE" apparently stands for account executive. Derivative Products refers to hedging techniques, such as stock index futures, short positions, short sales and synthetic shorts using options.

**3.** Apparently, many portfolios hold some securities for which no adequate hedging technique was available, thereby insuring the exposure to risk. Grigoli Aff. ¶ 5.

insurance"[4] and a principal in Leland O'Brien Rubinstein Associates Inc. ("LOR"), at a financial conference in Singapore where both were featured speakers. They discussed methods of creating a guaranteed investment fund for individual investors by using LOR's methods to lay off the fund's risks through other financial instruments.[5] Grigoli Dep. at 57–61. LOR had an existing relationship with Aetna Life Insurance Company ("Aetna") whereby Aetna indemnified the results of certain LOR investment strategies. Ferguson Aff. ¶ 23.[6]

Between October 1986 and June 1987, Peter Zimmermann, a Merrill Lynch employee of the consumer markets division and also chairman of the Task Force, continued to explore the idea with O'Brien, Ferguson, and Aetna. Ferguson states in his affidavit that "portfolio insurance" concepts were commonplace by 1986 and refers to several variations which were being used and publicly discussed well before 1986. Ferguson Aff. and exhibits thereto. He described the approach taken by LOR to set up the Fund and the basic financial concepts underlying it. *Id.* He also points out that the Fund differs in various aspects from Granoff's proposal. *Id.*

Defendants also submit an Affidavit of Ralph S. Tate sworn to on November 20, 1990 ("Tate Aff."), an Aetna executive who was involved in the development of the Fund and whose statements are also unrebutted. In June of 1986 Aetna had been offering "portfolio insurance" backed by an Aetna guarantee, called Guaranteed Equity Management ("GEM"), since 1983. Tate Aff. ¶ 5. Aetna managed GEM through the use of a proprietary computer program called DAARMS, short for Dynamic Asset Allocation Risk Management Strategies, which Aetna licensed from LOR. Tate Aff. ¶ 8. DAARMS was based on mathematical algorithms and portfolio management theories developed by two of the founding partners of LOR, both of whom were professors of finance at the University of California at Berkeley. Ferguson Aff. ¶¶ 7–10. DAARMS was later licensed to Aetna in 1983 for its use in managing the Fund. *Id.* ¶ 10.

Ferguson states that, between 1984 and 1986, he made several presentations to Merrill Lynch's top management regarding LOR's computer programs and how Merrill Lynch might use those programs to develop a financial offering to compete with other forms of portfolio insurance or guaranteed funds. Ferguson Aff. ¶ 15.

Galbreath and Nixon affirm they did not discuss Granoff's proposal with others, nor did they know that members of the Task Force were having the above discussions with LOR and Aetna. Deposition of Michael J. Galbreath of December 21, 1989 ("Galbreath Dep.") at 65, Nixon Dep. at 117. Members of the Task Force, Grigoli and Zimmerman, state in sworn affidavits and at deposition that they had no knowledge of plaintiff or his ideas and developed the Fund independently. Affidavit of Carmine S. Grigoli, sworn to on November 26, 1989 ("Grigoli Aff."), Affidavit of Peter F. Zimmerman, sworn to on March 2, 1990 ("Zimmerman Aff."). Ferguson's affidavit states that his review of the six-page Granoff proposal shows it was neither novel nor distinctive, nor was it executable or fully defined in the form communicated to defendants. Ferguson Aff. ¶ 26. Tate, in his affidavit, also disclaims any awareness of Granoff and his PPI. Tate Aff. ¶ 16.

### III. The Nature of the Fund

The Fund is set up as a limited partnership with Merrill Lynch Options/Futures Management as the general partner; inves-

---

**4.** "Portfolio insurance," as commonly used in trade publications at that time, consisted of the utilization of hedging techniques, not guarantees by insurance companies. Affidavit of Robert Ferguson, sworn to on November 28, 1990 ("Ferguson Aff.") and exhibits thereto.

**5.** LOR is a firm which was founded in 1981 and which has specialized in an investment strategy known as "Dynamic Asset Allocation," which uses mathematical formulae and computer programs to shift the assets in a given portfolio in response to the passage of time and to movement in the financial markets, creating an artificial "put" as a hedge against losses.

**6.** At the time of this deposition, Ferguson was an officer of LOR.

tors become limited partners by purchasing units in the Fund. Exhibit R to Granoff Aff. The Fund invests in a portfolio of Treasury bills and stock index futures and does not invest in shares of common stock. *Id.* The underlying concept is that the Fund should realize gains from its position in stock index futures position during markets when the stock index is rising and will limit any losses by reducing its stock index futures position and shifting more of its assets into Treasury bills when the stock market starts to decline. *Id.* The shifting of assets is repeated with the fluctuations in the market and is managed by the use of program trading and a strategy denominated as "dynamic hedging." *Id.* Any downside loss of more than 10% is protected by an Aetna guarantee in the form of a surety bond. *Id.* The guarantee is effective only as to the Net Asset Value per Fund unit at the end of specified "Time Horizons," which in the case of the Fund is normally a period of 12 months. *Id.* While profitability is not generally guaranteed, the Fund does provide for a "profit lock-in" whereby the amount guaranteed by Aetna increases automatically whenever the Net Asset Value of the Fund increases by 10% or more during a single Time Horizon period. At the end of the time period in which the Fund's value has increased by 10% or more, the guarantee against loss is increased by the same percentage to insure against a loss of more than a 10% of the value reached during that Time Horizon. *Id.* This step-up occurs every time the Net Asset Value of the Fund rises 10% or more over what it was at the end of the prior Time Horizon. *Id.* If this step-up does not occur during a given Time Horizon, the guarantee for the start of the new Time Horizon is set at 90% of what the Net Asset Value was at the end of the expired period. *Id.*

Plaintiff's statement pursuant to S.D.N.Y. & E.D.N.Y. Rule 3(g) does not cite either any evidence contradicting any of defendants' allegations of material fact relating to Merrill Lynch's independent development of the Fund or any evidence that his PPI concept had in fact been utilized in whole or in part in the development of the Fund. To rebut defendants' affidavits as to the lack of any use of PPI, plaintiff relies on two assertions: (1) that he proposed PPI, and (2) that PPI is similar to the Fund.

## DISCUSSION

■ In its prior opinion, the Court stated in part:

> Genuine issues of material fact exist relating to the plaintiff's concept of financing product and the novelty thereof. Furthermore, no discovery has taken place. Plaintiff is entitled to discovery to ascertain whether his concept has indeed been appropriated by defendants, as he has concluded from defendants' published materials.

To grant a motion for summary judgment, a court must find that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law because, after sufficient time for discovery, the non-moving party has failed to make a sufficient showing of an essential element of its case as to which it has the burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), and the Court must view the facts in the light most favorable to the non-moving party. *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir. 1985), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).

■ When, as here, a motion for summary judgment is supported with specific factual material such as depositions, affidavits and answers to interrogatories, the opposing party must come forward, by affidavit or as otherwise provided, with "specific facts showing that there is a genuine issue for trial" and may not rely only on the allegations or denials of his pleadings to defeat the motion. Fed.R.Civ.P. 56(e). A plaintiff's Rule 3(g) statement which consists of questions concerning the movant's statements of material fact is inadequate. By his treatment of the demands of Rule

3(g), plaintiff has failed to show a genuine issue of material fact. Accordingly, a review of plaintiff's answering papers has been undertaken to determine if such an issue exists.

■ Under New York law, absent "novelty and originality," a plaintiff cannot recover damages for a defendants' use of confidentially disclosed ideas. *Downey v. General Foods Corp.*, 31 N.Y.2d 56, 334 N.Y.S.2d 874, 286 N.E.2d 257 (1972). In *Downey*, the Court stated:

> An idea may be a property right. But, when one submits an idea to another, no promise to pay for its use may be implied, and no asserted agreement enforced, if the elements of novelty and originality are absent, since the property right in an idea is based upon these two elements.

31 N.Y.2d at 61, 334 N.Y.S.2d at 877, 286 N.E.2d at 260. *See also Bram v. Dannon Milk Products*, 33 A.D.2d 1010, 307 N.Y.S.2d 571 (1970) (Lack of novelty in an idea is fatal to any cause of action for its unlawful use); *Soule v. Bon Ami Co.*, 201 A.D. 794, 195 N.Y.S. 574 (1922); *Ferber v. Sterndent Corp.*, 51 N.Y.2d 782, 433 N.Y.S.2d 85, 412 N.E.2d 1311 (1980); *Ed Graham Productions, Inc., v. National Broadcasting Co., Inc.*, 75 Misc.2d 334, 347 N.Y.S.2d 766 (N.Y.Sup.Ct.1973) (where idea lacks novelty, no cause of action lies in contract or tort).

■ The Second Circuit recognized the validity of *Downey* in *Murray v. National Broadcasting Company, Inc.*, 844 F.2d 988, 994 (2d Cir.1988), *cert. denied*, 488 U.S. 955, 109 S.Ct. 391, 102 L.Ed.2d 380 (1988).[7] There, the Court held that New York law requires a showing of novelty in an action for breach of implied contract, misappropriation of an idea, conversion, and unjust enrichment. Affirming Judge Cedarbaum's grant of summary judgment for the defendants, the Court stated:

Because we agree with the district court's conclusion that, under New York law, lack of novelty in an idea precludes plaintiff from maintaining a cause of action to prevent its unauthorized use, we affirm the district court's order granting summary judgment and dismissing the complaint.

\*      \*      \*      \*      \*      \*

Those ideas that are not novel 'are in the public domain and may freely be used by anyone with impunity.' Since such non-novel ideas are not protectible as property, they cannot be stolen (citations omitted).

*Id.* at 990–993. Here, plaintiff is suing not on implied contract but on a written agreement. However, to meet the requirement of minimal consideration, even actions on express contracts must involve the use of an idea which is novel. Without novelty, no property right exists in plaintiff, and there is no consideration giving rise to defendants' obligation. *Educational Sales Program, Inc. v. Dreyfus Corp.*, 65 Misc.2d 412, 414, 317 N.Y.S.2d 840 (1970). Accordingly, all of plaintiff's causes of actions, each of which is based on the foundation that plaintiff had a valid property right, must be dismissed unless there is a genuine issue as to the novelty of plaintiff's idea.

■ It is not sufficient for plaintiff to assert the novelty of his idea; he must present some basis in fact for that claim. In *Murray*, Judge Cedarbaum found that the idea at issue was not, as plaintiff had argued, novel, because the evidence showed that the plaintiff had merely combined two ideas, the family situation comedy and the casting of a black middle-class family in non-stereotyped portrayals, two ideas which had long been in wide circulation in the television industry. The evidence also showed that other persons had discussed similar ideas for a program several years before the plaintiff drafted his proposal. Judge Cedarbaum assumed for

---

7. "[H]owever the claim for relief is framed, any inference of use, drawn, for example, from the facts of disclosure and similarity, very plainly may be rebutted by the defendant's demonstration that it developed the claimed similar concept independently without reference to whatever material plaintiff submitted." *Vantage Point, Inc. v. Parker Bros., Inc.*, 529 F.Supp. 1204, 1210 n. 3 (E.D.N.Y.1981).

purposes of the motion that use had been made by the defendants, but she found against the plaintiff because his idea lacked novelty.

Granoff asserts that PPI as presented was novel. This assertion is based on his own reading of the financial pages of The New York Times; on earlier statements made to him by Marsh & McLennon executives; on his experience in the insurance industry and as a consultant; and also on an affidavit of Phillip Pfoff, an associate professor of finance at Canisus College, Buffalo, New York, which was submitted on the defendants' earlier, premature, motion for summary judgment. Granoff Dep. at 160–161. The Court is unable to credit the affidavit of Mr. Pfoff since it fails to contradict the assertions of pre-existing financial products as contained in the affidavits of Mr. Ferguson and Mr. Tate. Affidavits of an expert submitted on a motion for summary judgment of this type should show knowledge of the opposing contentions of fact developed during discovery and deal with those contentions. The Pfoff affidavit is sworn to on July 1, 1989, prior to any discovery. Accordingly, it not only does not, but also cannot meet this test.

No affidavits having been submitted from Marsh & McLennon executives, their views expressed to Granoff in 1984 or 1985 are hearsay and not evidence before this Court.[8]

Plaintiff's affidavit describes his proposal as a concept. The concept is described by Granoff as "an investment product in which the sponsor (e.g., the brokerage house, such as Merrill Lynch, selling the investment product) or an entity specified by the sponsor, guarantees at the end of a fixed time period that stock portfolios of investors will not decrease in value beyond a predetermined percentage utilizing hedging techniques, such as those existing with portfolio insurance, to render the risk to the entity making the guarantee economically feasible." Granoff Aff. ¶ 4.[9]

A review of the six pages describing PPI, which Granoff states he left with Galbreath and Nixon on June 30, 1986 or July 1, 1986, leads to the conclusion that Granoff was proposing that sort of concept, namely, that of offering insurance protection for customers' portfolios under at least three different scenarios. The pertinent portions of plaintiff's proposal read as follows:

> The purpose of Portfolio Protection Insurance coverage (PPI) is, among other things, to afford protection to an institution or other entity (insurance company, bank, pension fund, mutual fund, large private portfolio, trust department, and so forth) against excessive losses in its equity and debt portfolio. Under one possible insurance coverage scenario, the investment portfolio in place at the time coverage is purchased is fixed and followed until the end of the coverage period, months later, at which time unrealized losses in all stocks and bonds in the fixed portfolio are determined and the insured (institution) is indemnified for that amount less a fixed insured retention of, say, 10% of the value of the fixed portfolio at the beginning of the coverage period ...

> \* \* \* \* \* \*

> Coverage may be developed to include realized losses induced by sales from the fixed portfolio if care is taken to prevent undue acceleration of security sales for the purpose of piercing the retention.

> \* \* \* \* \* \*

> Coverage may also be developed to accommodate additions to the fixed portfolio during the coverage period, making this an audited line of insurance and, if combined with realized loss protection, a more complex one as well.

> \* \* \* \* \* \*

---

**8.** Plaintiff does not submit the financial pages of The New York Times upon which he relies and, in any event, that publication is not regarded by the Court as an authoritative, exhaustive source about any existing financial products in June of 1986.

**9.** In his affidavit, Granoff claims he suggested to Merrill Lynch the aggregation of portfolios to resemble the overall market and determine what index options, other options, futures or option on futures should be purchased to afford the coverage. Granoff Aff. ¶ 4.

Another possible coverage scenario contemplates the sale of financial futures (stock index and interest-sensitive futures). Here the contracts are entered into at the beginning of the coverage period. Such a transaction would "freeze" the value of the insured's portfolio until the delivery date of the futures contracts; i.e., insure that the value of the portfolio is essentially unchanged during the coverage period. Tax and stability considerations make this coverage a likely purchase (see next paragraph). If the insured's portfolio falls in value during the coverage period, it is indemnified in an amount commensurate with the gain in the futures contracts. If the insured's portfolio falls in value during the coverage period, it is indemnified in an amount commensurate with the gain in the futures contracts. If the insured's portfolio rises in value, the audited premium due the insurer will reflect an amount commensurate with the loss in the futures contracts. (Coverage may be developed under this scenario to indemnify the insured for part, but not all, of any loss in portfolio value. This would entail a greater profit potential for the insurer.)

Yet another coverage scenario would entail the use of options on futures, whereby the policy would insure that the value of the insured's portfolio can be "frozen", at the election of the insured, at any time the policy is in effect.

These scenarios have one common thread, the utilization of insurance to provide to an investor an unconditional guarantee that its portfolio would not lose more than a stated percentage of its investment. The descriptions of the various scenarios are rudimentary at best, although they show some knowledge of the concepts of hedging techniques, stock options and futures options, as well as the attractiveness of a guarantee against loss to investors. Ferguson Aff. ¶ 26.

Defendants have shown, however, that plaintiff's concept was not a new idea. The GEM product offered in 1983 by Aetna contained a guaranty by Aetna to institutional investors against losses beyond a stated percentage on a portfolio of equities at the end of a stated time period. Tate Aff. ¶ 5, Exh. A. Mr. Tate had played with this idea since 1973.[10] Tate Aff. ¶ 5. Similarly, individual shareholders in a number of mutual funds had for a number of years been offered insurance against loss by Harleysville Mutual Life Insurance Company and Prudential Insurance Company. *Cf.* Gatto Geske Litzenberger & Sosin, *Mutual Fund Insurance* 8 J.Fin.Econ. 283 (1980). Exhibit A to Affidavit of Glenn E. Butash sworn to on November 21, 1990 ("Butash Aff.").[11]

There is little, if any, difference between the concept of either of these financial products and plaintiff's "Portfolio Protection Insurance." Accordingly, plaintiff's concept was not novel and plaintiff cannot recover for the use of his concept. *Downey, supra, Bram v. Dannon, supra, Murray, supra.*

Nor can plaintiff show by inference that Merrill Lynch copied any part of the proposal he submitted. As detailed below, portions of the "scenarios" he sets forth in PPI either were already in use or were not used in the Fund:

1. Guarantees by insurers against loss of stock portfolio pre-existed plaintiff's proposal. Gatto, Geske Litzenberger & Sosin, *supra,* Tate Aff. ¶ 5.

2. Hedging strategies and sophisticated trading strategies to contain portfolio losses pre-existed plaintiff's proposal. Granoff Dep. at 584–585, Ferguson Aff, Exh. A–D.

---

**10.** As shown by the Tate and Ferguson affidavits as early as 1983, GEM offered a guarantee against loss by Aetna of a portfolio of a customer managed by Aetna and hedged by a trading strategy, DAARMS, developed by LOR against losses in the portfolio and guaranteed a minimum rate of return, as well as protection of the original investment.

**11.** Plaintiff's suggestion in PPI that Merrill Lynch should aggregate portfolios of its customers is little more than a method of creating the equivalent of a mutual fund for portfolio insurance purposes.

3. A combination of hedging and trading strategies and a guarantee against loss existed in GEM. Tate Aff. ¶ 5.[12]

4. In June 1986 portfolio insurance products existed which offered to mutual fund holders a guarantee against loss at the end of a specified period of time (e.g. Harleysville Insurance). Ferguson Aff. ¶ 26, Butash Aff. ¶ 5.

Furthermore, the Fund and PPI are dissimilar in that (a) the Fund is structured as a limited partnership requiring a purchase of a unit of interest, not a conglomeration of existing customer portfolios as proposed in PPI; (b) the Fund's customers are offered investment in Treasury securities and participation in a stock index fund consisting of stock index futures contracts; the Fund does not utilize a customer's pre-existing equity or debt portfolio as proposed in PPI; (c) the Fund is hedged daily by an ever changing treasury portfolio, not by a formula using index option futures or options on futures as contemplated by plaintiff's PPI; (d) the Fund also provides a continual guarantee, not a guarantee only at the end of an investment period as proposed by PPI. Thus, if the PPI, as proposed by plaintiff, is considered to contain not just a concept but a plan for implementation of a unique nature, defendants' Fund did not utilize PPI's plan or any novel feature of it.

In short, plaintiff has failed to offer any supporting evidence of the novelty of his PPI. Because his idea was not novel, plaintiff did not own a property interest in it. Since all his claims (i.e., breach of contract, fraud, and misappropriation of property) are based on a claim of a property interest, they must be dismissed.

Furthermore, plaintiff has not presented any proof to counter defendants' affidavits that the Fund was conceived and implemented by a separate group of Merrill Lynch executives, independent of any assistance from plaintiff and without knowledge of his submission of PPI. Grigoli Dep. at 51, 53, 54, Affidavit of Peter Zimmerman, sworn to on March 2, 1989, ¶ 18; Ferguson Aff. ¶ 25; Tate Aff. ¶ 16, Galbreath Dep. at 108; Nixon Dep. at 82–93. Defendants have shown an alternate source for the concept, development and implementation of the Fund wholly independent of plaintiff. Grigoli Aff. and Zimmerman Aff. Messrs. Galbreath and Nixon attest that they did not convey plaintiff's proposal to the Task Force on Derivative Products Strategy, the group which was developing the Price Guarantee Program; those executives attest that they did not know that a program like the Fund was under consideration. Messrs. Tate and Ferguson of Aetna and LOR, respectively, corroborate that the Fund was developed independently and without input from the PPI proposal or from Mr. Granoff.

Accordingly, plaintiff has failed to demonstrate there is a genuine issue as to material fact with respect to defendants' proof of:

1. the lack of novelty of plaintiff's concept;

2. the lack of resemblance of plaintiff's concept to the Fund;

3. the lack of use of plaintiff's concept by the Fund.

### CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is granted.

IT IS SO ORDERED.

---

**12.** A guarantee against a loss of more than 10% was considered by Merrill Lynch in May 1984.

Page 71 of Exhibit J to Butash Aff.