**WRENCH LLC, a Michigan Limited Liability Company; Joseph Shields; and Thomas Rinks, Plaintiffs,**

v.

**TACO BELL CORP., a foreign corporation, Defendant.**

No. 1:98–CV–45.

United States District Court,
W.D. Michigan,
Southern Division.

June 10, 1999.

Douglas A. Dozeman, Valerie Ann Pierre Simmons, Warner, Norcross & Judd, LLP, Grand Rapids, MI, for plaintiffs.

Richard J. O'Brien, Sidley & Austin, Chicago, IL, Randall G. Litton, Price, Heneveld, Cooper, Dewitt, et al, Grand Rapids, MI, Arthur S. Friedman, Friedman, Wang & Bleiberg, PC, New York City, for defendant.

## OPINION

QUIST, District Judge.

This case is about two dogs: Gidget, a live female Chihuahua who stars in Defendant, Taco Bell Corp.'s ("Taco Bell"), popular television commercials as the suave male Chihuahua with a taste for Taco Bell food and known for the line, "Yo quiero Taco Bell" ("I want some Taco Bell"), and "Psycho Chihuahua," Plaintiffs' caricature of a feisty, edgy, confident Chihuahua with a big dog's attitude. The question at the bottom of this dispute is whether Taco Bell's live Chihuahua is Psycho Chihuahua incarnate. Plaintiffs contend that Taco Bell used their ideas based on Psycho Chihuahua to create the live Chihuahua character featured in Taco Bell's current advertising campaign and have sued Taco Bell alleging claims for breach of implied contract, misappropriation, conversion, and unfair competition. Now before the Court is Taco Bell's motion for summary judgment.

### Facts

Plaintiffs reside in Grand Rapids, Michigan, and are the developers and promoters of a cartoon character known as "Psycho Chihuahua." Taco Bell is a franchisor of fast food Mexican restaurants, with its principal offices in Irvine, California.

Plaintiffs Thomas Rinks ("Rinks") and Joseph Shields ("Shields") developed Psycho Chihuahua sometime in early 1995. Psycho Chihuahua depicted a clever, feisty Chihuahua dog with a "do-not-back-down" attitude. (Shields Dep. at 88, Def.'s App. B2 Ex. 18; see also 1st Am.Compl. ¶ 7.) Rinks and Shields promoted and marketed Psycho Chihuahua through Wrench LLC ("Wrench"), their wholly-owned limited liability company. Plaintiffs initially market-

ed Psycho Chihuahua on a small scale through use on T-shirts and other merchandise. However, by early 1996, Wrench had licensed the rights to produce the apparel to several large manufacturers.

In June 1996, Rinks and Shields attended a licensing trade show in New York City to promote Psycho Chihuahua. Ed Alfaro ("Alfaro"), Taco Bell's Creative Services Manager, and Alfaro's boss, Rudy Pollak ("Pollak"), Taco Bell's Vice President of Administration and Employee Programs, also attended the show. Alfaro and Pollak had gone to the show in order to meet with a licensing agent and obtain ideas for use in a potential Taco Bell retail licensing program. Alfaro was part of a department known at Taco Bell as "Visionary Infoworks." Alfaro's department was in charge of developing the Taco Bell licensing program, which was separate from Taco Bell's marketing department. During the show, Alfaro noticed the Psycho Chihuahua display, and he and Pollak approached Rinks and Shields to talk about the character. Alfaro, who was immediately taken with Psycho Chihuahua, saw it as a "strong character" that would appeal to Taco Bell's core consumers, males ages 18–24. (See Alfaro Dep. at 46–48, Def.'s App. B Ex. 2.) Alfaro and Pollak spoke briefly with Rinks and Shields and obtained some Psycho Chihuahua materials to take with them to Taco Bell's headquarters in California.

After returning to California, Alfaro began to promote Psycho Chihuahua within the company as a potential Taco Bell corporate "icon." Alfaro contacted Rinks and asked him to create art boards combining Psycho Chihuahua with the Taco Bell name and image. Shortly after Alfaro made the request, Rinks and Shields prepared and sent several art boards to Alfaro, along with Psycho Chihuahua T-shirts, hats, and stickers for Alfaro to use in promoting Psycho Chihuahua at Taco Bell.

Alfaro introduced Psycho Chihuahua at Taco Bell by passing out the Psycho Chihuahua items that Rinks and Shields had sent him and meeting with top executives to gain their support for the character. Because Alfaro was not a part of the marketing group, he first sought to gain the support of top executives outside of the marketing department to gain support for his clan to sell the character to the marketing department.[1] In late July or August, Alfaro held separate meetings with Joaquin Palaez, Taco Bell's Vice President of Quality and Technology, and Olden Lee, Taco Bell's Senior Vice President of Human Resources, to introduce them to Psycho Chihuahua and receive comments on the character. Later, Alfaro showed the materials to other executives, including Vada Hill, Taco Bell's Vice President of Brand Management. Alfaro and Pollak also presented the Psycho Chihuahua materials to Taco Bell's then-outside advertising agency, Bozell Worldwide. In addition, Alfaro presented Psycho Chihuahua and other graphic designs to a series of focus groups to gauge consumer reaction to the designs as potential Taco Bell icons. Psycho Chihuahua was the best received design. (*See* Alfaro Dep. at 90.)

In September 1996, Wrench hired Strategy Licensing ("Strategy"), a Connecticut-based licensing agent. Arlene Scanlan ("Scanlan") and Neal Seideman ("Seideman"), the Strategy representatives for Wrench, became involved in the communications with Alfaro. On September 11, 1996, Scanlan wrote a letter to Alfaro thanking him for his help in promoting Psycho Chihuahua at Taco Bell and expressing her enthusiasm for "the opportunity to work alongside the Taco Bell brand...." (Letter from Scanlan to Alfaro of 9/11/96, Pls.' App.Ex. 7.) Scanlan also enclosed marketing boards and other Psycho Chihuahua materials for the presenta-

tion to Bozell, which described Psycho Chihuahua as "irreverent," "edgy," and "spicy" with an "over-the-top" attitude and an "insatiable craving" for Taco Bell food. (*See* Pls.' App.Ex. 8.) Wrench also sent additional materials to Alfaro, which included marketing boards, point of purchase drawings, and commercial scripts. (*See* Pls.' App.Ex. 9.) Throughout the late summer and fall, Alfaro continued his discussions with Rinks about developing Psycho Chihuahua for Taco Bell's use.

In November 1996, Scanlan and Seideman attended a meeting with Pollak, Alfaro, and two other members of Alfaro's group. Topics of the meeting included Taco Bell's past marketing efforts and future marketing plans, and the scope of potential use of Psycho Chihuahua. In particular, the parties discussed broadening the use from merely applications in sales of retail merchandise such as T-shirts, as originally envisioned by Alfaro's group, to use in Taco Bell's advertising. At the conclusion of the meeting, Pollak asked Scanlan to prepare a proposal of the terms for Taco Bell's use of Psycho Chihuahua.

Scanlan sent a proposal to Alfaro on November 18, 1996, based on a licensing agreement that Scanlan had worked on for PepsiCo's use of a character known as Fido Dido. (*See* Scanlan Dep. at 198–99, 351, Pls.' Dep.App.) The proposal provided that Taco Bell would pay Wrench a percentage based upon the amount of money spent on advertising, a percentage of Taco Bell's retail licensing sales, and a percentage based on the cost of premiums, such as toys sold in Taco Bell restaurants. (*See id.* at 393–94; Letter from Scanlan to Alfaro of 11/18/96, Pls.' App.Ex. 11.) Taco Bell did not accept the proposal, although it did not explicitly reject it or indicate that it was ceasing further discussions. (*See*

---

1. In a memorandum dated January 14, 1997, Arlene Scanlan, wrench's licensing agent, recognized that "politics at [Taco Bell] prevent[ed] [Alfaro] from pushing [Psycho Chihuahua] on [Taco Bell's] marketing depart-

ment...." (Scanlan Mem. of 1/14/97, Pls.' App.Ex. 13.) Thus, Scanlan was careful to bear in mind that any Psycho Chihuahua materials presented to Alfaro had to be "politically correct." (*Id.*)

Scanlan Dep. at 202–04, Pls.' Dep.App.) In fact, Alfaro continued to talk with Wrench and promote Psycho Chihuahua within Taco Bell. On December 5, 1996, Alfaro and Pollack met with Vada Hill, who then held the position of Chief Marketing Officer, and others to present licensing various ideas, including Psycho Chihuahua. (*See* Hill Dep. at 123–25, Pls.' Dep.App.) A few days later, Pollak told Alfaro that they should continue to work on the Psycho Chihuahua idea to show Vada Hill "a better alternative" to other ideas under consideration "if there [was] one!" (E-mail from Pollak to Alfaro of 12/9/96, Pls.' App. Ex. 15.)

In February 1997, Alfaro traveled to Grand Rapids, for a meeting with Rinks, Shields, Scanlan, and Seideman to review and finalize a formal presentation featuring Psycho Chihuahua to be presented to Taco Bell's marketing department in early March 1997. During the meeting, Wrench presented ideas for an advertising, licensing, and promotional campaign called "Go Psycho at Taco Bell." (*See* Pls.' App.Ex. 16.) The ideas discussed included using a live dog manipulated through CGI (computer graphics imaging) (*See id.*) The participants also discussed ideas for commercials, such as a male Chihuahua passing up a female Chihuahua, the use of a bobbing head doll, and a Chihuahua head popping out of a circle at the end of commercials. (*See* Alfaro Dep. at 209–10, Rinks Dep. at 248–49, Pls.' Dep.App.)

By coincidence, while Alfaro was working with Rinks and Shields on producing the presentation for the marketing department, another firm, TLP Partnership ("TLP"), was also promoting Psycho Chihuahua to Taco Bell as one of several possible ideas for a Cinco de Mayo or summer promotion.[2] On February 6, 1997, TLP made a presentation to members of Taco Bell's marketing department which included Psycho Chihuahua. (*See*

C. Hennessy Dep. at 12–17, Def.'s App. B1 Ex. 8; Pls.' App.Ex. 20.) TLP had discovered Psycho Chihuahua at a trade show in New York and received Strategy's consent to use the image in its presentation. Alfaro was not aware of TLP's presentation. Following the presentation, Taco Bell conducted a series of focus groups to research consumer reaction to TLP's ideas. Psycho Chihuahua was one of two ideas that sparked positive consumer reaction. (*See* Pls.' App.Ex. 23 at TB000291.) However, Taco Bell did not use any of TLP's ideas. (*See* M. Hennessy Dep. at 29, Def.'s App. B1 Ex. 9.)

Alfaro was unable to arrange a meeting during March 1997 with the marketing department to present the Psycho Chihuahua materials. However, on April 4, 1997, Scanlan and Seideman made a formal presentation of the "Go Psycho" campaign to Alfaro and his group using samples of uniform designs, T-shirts, food wrappers, posters, and cup designs based upon the ideas discussed during the February 6, 1997, meeting. Scanlan and Seideman also presented storyboards depicting two of the ideas for commercials discussed during the February 6, 1997, meeting. (*See* Pls.' App. Ex. 28.) Alfaro and his group were impressed with the "Go Psycho" materials.

On March 18, 1997, Taco Bell hired a new advertising agency, TBWA Chiat/Day ("Chiat/Day") In a meeting held a few days later, Taco Bell briefed Chiat/Day on the history of its brand, its marketing history, its consumer profile, and its past advertising campaigns. Taco Bell advised Chiat/Day that it wanted a campaign ready to launch by July 1997 that would reconnect Taco Bell with its core group of consumers, males 18 to 24 years old. Chuck Bennett ("Bennett") and Clay Williams ("Williams") were asked to work on the Taco Bell account as creative directors. Bennett's and Williams' prior collaborative efforts included a commercial spot which

---

**2.** Cinco de Mayo is the Mexican holiday that celebrates the victory of Mexican troops over French forces in Puebla, Mexico on May 5,

1862. *See Random House Dictionary of the English Language* 373 (2d ed.1987).

they made for Nissan Motor Corp. This spot featured several dogs, including a Chihuahua, taking a sport utility vehicle and its owner for a joy ride. (*See* Bennett Dep. at 221–22, Def.'s App. B2 Ex. 3; Williams Dep. at 370, Def.'s App.B.Ex. 23.)

By late May, Bennett and Williams had come up with approximately thirty ideas for television commercials. Many of the ideas were based on the theme: "There's something inside you that's hungry for Taco Bell," which Chiat/Day had developed based on feedback from the focus groups. The main theme presented was the "Burp" idea, in which various characters would burp in different "humorous circumstances." Chiat/Day presented these ideas in a meeting held on May 20, 1997. Taco Bell did not like the ideas.

On June 2, 1997, Bennett and Williams made another presentation to Taco Bell in which they presented several new themes, including one called the "Hunger Monster," one called the "Pink Room," which was intended to depict different scenes showing a person's stomach and incorporated the "Something Inside You is Hungry For Taco Bell," and one involving a Chihuahua, in which a male Chihuahua would pass up a female Chihuahua to get to a person seated on a bench eating Taco Bell food.

According to Bennett and Williams, they conceived the "Chihuahua" idea as they were having lunch on a Sunday afternoon at an outdoor Mexican restaurant. (Bennett Dep. at 203–05; Williams Dep. at 174–75.) According to them, as they sat there, they noticed a Chihuahua trotting down the street that appeared to be on a mission, and thought that using a Chihuahua may be "a way of personifying the intense desire for Taco Bell" food. (Williams Dep. at 180.) Williams wrote a script using the Chihuahua, which was presented to Taco Bell at the June 2, 1997, meeting. (*See* Pls.' App.Ex. 35.)

Following the June 2 meeting Chiat/Day conducted focus groups to test consumer reaction to the proposed ideas. After reviewing the focus group results, a decision was made to produce three commercials based on the "Pink Room" idea, a commercial called "Bigger is Better," and one "Chihuahua" commercial. (*See* Miller Dep. at 184, Def.'s App. B2 Ex. 12.)

In June 1997, Alfaro met with Scanlan and Seideman at the same licensing show in New York at which he had discovered Psycho Chihuahua a year earlier and told Scanlan that he was still interested in using Psycho Chihuahua. (*See* Pls.' App.Ex. 36.) On June 26, 1997, Scanlan sent Alfaro materials from the "Go Psycho" campaign to use in a meeting with Chiat/Day. (*See* Letter from Scanlan to Alfaro of 6/26/97, Pls.' App.Ex. 37.) Sometime during that month Alfaro had learned that Chiat/Day was planning to use a Chihuahua in a commercial, and he believed that he still might be able to persuade the marketing department to use Psycho Chihuahua. Alfaro left a voice mail with Vada Hill about the prospect, and Hill forwarded the message to Chris Miller, Taco Bell's Advertising Manager and the liaison between the marketing department and Chiat/Day. (*See* Miller Dep. at 198–99, Pls.' Dep.App.) On June 27, 1997, Alfaro passed the materials along to Miller along with a note suggesting that Taco Bell consider using Psycho Chihuahua as an icon and as a character in its advertising. (*See* Mem. from Alfaro to Miller of 6/27/97, Def.'s App. D Ex. 6.) The materials were received by Chiat/Day sometime between June 28 and July 26. (*See* E-mail from Miller to Alfaro of 7/26/97, Def.'s App. D Ex. 7.)

The "Chihuahua" and "Pink Room" commercials were shown regionally sometime in July. Based upon feedback from focus groups, Chiat/Day determined that the reaction to "Chihuahua" was very positive. On that basis, Taco Bell decided that the Chihuahua would be the focus of its 1998 campaign, and on December 28, 1997, Taco Bell launched its national campaign. To this day, Taco Bell continues to air com-

mercials using the Chihuahua. Taco Bell's Chihuahua commercials have been very successful.

### Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56. The rule requires that the disputed facts be material. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute over trivial facts which are not necessary in order to apply the substantive law does not prevent the granting of a motion for summary judgment. *Id.* at 248, 106 S.Ct. at 2510. The rule also requires the dispute to be genuine. A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.* This standard requires the non-moving party to present more than a scintilla of evidence to defeat the motion. *Id.* at 251, 106 S.Ct. at 2511 (citing *Improvement Co. v. Munson*, 14 Wall. 442, 448, 20 L.Ed. 867 (1872)).

A moving party who does not have the burden of proof at trial may properly support a motion for summary judgment by showing the court that there is no evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). If the motion is so supported, the party opposing the motion must then demonstrate with "concrete evidence" that there is a genuine issue of material fact for trial. *Id.; Frank v. D'Ambrosi*, 4 F.3d 1378, 1384 (6th Cir.1993). The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Financial Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

### Discussion

In its prior opinion issued on June 18, 1998, this Court granted in part and denied in part Taco Bell's motion to dismiss, leaving intact the breach of implied contract, misappropriation, conversion, and unfair competition claims. *See Wrench LLC v. Taco Bell Corp.*, No. 1:98–CV–45, 1998 WL 480871, at *9 (W.D.Mich. June 18, 1998) (*"Wrench I "*). In particular, the Court held that Plaintiffs' misappropriation, conversion, and unfair competition claims were not preempted by § 301(a) of the Copyright Act because they require Plaintiffs to prove an extra element not required for a copyright infringement claim, namely, the existence of a legal relationship arising from an implied contract. *See id.* at *7–9. In a supplemental opinion denying Taco Bell's renewed motion to dismiss Counts II through V of Plaintiffs' First Amended Complaint and granting Taco Bell's motion to strike, the Court struck Plaintiffs' allegations of a legal relationship arising from a quasi contract on the basis that such allegations were inconsistent with the Court's earlier determination that Plaintiffs' unjust enrichment claim was preempted. *See Wrench LLC v. Taco Bell Corp.*, 36 F.Supp.2d 787, 790–91 (W.D.Mich.1998) (*"Wrench II "*).

In its present motion, Taco Bell contends that it is entitled to summary judgment because: (1) Plaintiffs have not established an implied in fact contract, or alternately, if they have, their claims are preempted by the Copyright Act because the implied contract creates legal rights that are equivalent to the rights within the general scope of copyright; (2) the concept of using a live Chihuahua in Taco Bell commercials was independently created by Chiat/Day; and (3) Plaintiffs' ideas were not novel.

As discussed below, the Court concludes that although Plaintiffs have presented sufficient evidence to establish an implied

in fact contract, those claims are subject to copyright preemption. Although the Court concludes that Plaintiffs' claims are preempted, it will also address Taco Bell's independent creation and novelty arguments.

## I. Implied In Fact Contract

■ A contract between two parties may be implied in fact when the intention to enter into a contract "is not manifested by direct or explicit words between the parties," but instead is "gathered by implication or proper deduction from the conduct of the parties, language used, or things done by them, or other pertinent circumstances attending the transaction." *Miller v. Stevens,* 224 Mich. 626, 632, 195 N.W. 481, 482 (1923); *see also Featherston v. Steinhoff,* 226 Mich.App. 584, 589, 575 N.W.2d 6, 9 (1997) (noting that "[w]here the parties do not explicitly manifest their intent to contract by words, their intent may be gathered by implication from their conduct, language, and other circumstances attending the transaction"). "An implied contract, like other contracts, requires mutual assent and consideration" and is treated in all other respects like an express contract. *Spruytte v. Department of Corrections,* 82 Mich.App. 145, 147, 266 N.W.2d 482, 483 (1978). Therefore, "[i]n determining whether there is a contract implied in fact, the courts look to the acts and conduct of the parties to determine whether the essential elements of an express contract have been established." *Lawrence v. Ingham County Health Dep't Family Planning/Pre–Natal Clinic,* 160 Mich.App. 420, 422 n. 1, 408 N.W.2d 461, 462 n. 1 (1987).

■ Implied in fact contracts often arise where one accepts a benefit from another for which compensation is customarily expected. *See Miller,* 224 Mich. at 632, 195 N.W. at 483. Thus, where evidence shows that the parties understood that compensation would be paid for services rendered, a promise to pay fair value may be implied, even if no agreement was reached as to price, duration, or other terms of the contract. *See In re Estate of Morris,* 193 Mich.App. 579, 583, 484 N.W.2d 755, 756–57 (1992).

■ Taco Bell concedes that there is sufficient evidence in the record to support Plaintiff's allegation that the parties had a basic understanding that if Taco Bell used the Psycho Chihuahua idea, concept, or image, that Taco Bell would compensate Plaintiffs for the fair value of such use. (*See* Def.'s Br.Supp. at 28 (citing Alfaro Dep. at 171–73; Pollack Dep. at 206).) However, Taco Bell argues that Plaintiffs cannot prove the existence of an implied in fact contract because the parties did not agree on any of the essential terms that would normally be included in a licensing agreement, such as price, duration, scope of use, and exclusivity. Plaintiffs agree that no agreement was reached on the terms that would normally be included in a licensing agreement, but argue that their understanding with Alfero that Taco Bell would pay Plaintiffs for the use of the Psycho Chihuahua materials if Taco Bell decided to use the Psycho Chihuahua idea is, by itself, sufficient to support an implied in fact contract.

Courts in several jurisdictions have agreed with Plaintiffs' contention that an implied in fact contract may be found when the parties have an understanding that the recipient of a valuable idea has accepted and used the idea, knowing that compensation is expected for use of the idea, without paying the purveyor of the idea. For example, in *Desny v. Wilder,* 46 Cal.2d 715, 299 P.2d 257 (1956), the plaintiff, at defendant's request, prepared an abbreviated movie script for defendant. Plaintiff communicated a synopsis of the script to defendant's secretary. Shortly thereafter, the defendant produced a movie that closely resembled the plaintiff's story, but did not pay plaintiff for it. The California Supreme Court concluded that there was a genuine issue of material fact as to whether an implied in fact contract existed. *See Desny,* 46 Cal.2d at 738, 299 P.2d at 269;

*see also Landsberg v. Scrabble Crossword Game Players, Inc.,* 802 F.2d 1193, 1196 (9th Cir.1986) (stating that "California law allows for recovery for the breach of an implied-in-fact contract when the recipient of a valuable idea accepts the information knowing that compensation is expected, and subsequently uses the idea without paying for it" (citing *Desney* )).

The Alaska Supreme Court reached a similar conclusion in *Reeves v. Alyeska Pipeline Service Co.,* 926 P.2d 1130 (Alaska 1996) (per curiam). Citing 3 David Nimmer, *Nimmer on Copyright,* § 16.05[D], at 16–40 (1994), the court noted that "a request by the recipient for disclosure usually implies a promise to pay for the idea if the recipient uses it." *Reeves,* 926 P.2d at 1141. The court held that a reasonable jury could find that an implied in fact contract was created because the plaintiff had shown that the defendant solicited the plaintiff's idea and later asked for a written proposal. *See id.*

Similarly, in *Riese v. QVC, Inc.,* No. 97–4068, 1999 WL 178545, 1999 U.S.Dist. LEXIS 3746 (E.D.Pa. Mar. 31, 1999) (mem.op.), the court concluded that a reasonable jury could find that an implied in fact contract was established where the plaintiff, who had provided the defendant with an idea for a television show, notified the defendant that he expected that he would act as the producer of the television show if his idea was used. *See Riese,* 1999 WL 178545, at *5, 1999 U.S.Dist. LEXIS 3746, at *16–17.

The Court agrees with the analysis in these cases and finds that Plaintiffs have presented sufficient evidence to create a genuine issue of material fact regarding whether an implied in fact contract existed between the parties. The cases establish that a plaintiff may support a claim of implied in fact contract by showing that the plaintiff disclosed an idea to the defendant at the defendant's request and the defendant understood that the plaintiff expected compensation for use of his ideas. Because Taco Bell concedes that there is sufficient evidence to support such an understanding in this case, Taco Bell's assertion that Plaintiffs cannot establish an implied in fact contract must be rejected.[3]

## II. Copyright Preemption

Taco Bell argues that even if the parties had an implied in fact contract that Taco Bell would pay Plaintiffs if it used their ideas and concepts, all of Plaintiffs' claims are preempted under § 301(a) of the federal Copyright Act because, apart from its label, the substance of Plaintiffs' implied in fact contract claim asserts rights that are equivalent to exclusive rights within the general scope of copyright.[4] If Taco Bell

---

3. Taco Bell presents two additional arguments concerning the creation of an implied in fact contract. First, Taco Bell argues that its rejection of an express contract, i.e., the proposal submitted by Scanlan in November 1996, shows that there was no implied in fact contract. However, Plaintiffs have shown that there is a genuine issue of material fact as to whether Taco Bell expressly rejected the proposal. Furthermore, Alfaro continued to work with Plaintiffs on developing ideas for Taco Bell after November 1996, and Taco Bell admits that there is evidence of an understanding that Plaintiffs would be paid if Taco Bell used their work.

Second, Taco Bell argues that Alfaro did not have authority to bind Taco Bell to an implied in fact agreement to pay Plaintiffs if Taco Bell used the Psycho Chihuahua idea. However, Plaintiffs have shown that there is a genuine issue of material fact on the issue of authority as well. (*See* Waller Dep. at 181, Pls.' Dep.App; Letter from Alfaro to Colao of 1/4/99, Pls.' Suppl.Br.Ex.A.)

4. Section 301 of the Copyright Act states, in relevant part:

On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

is correct, the case will end because Plaintiffs' implied in fact contract claim is the only possible "extra element" that can save their claims from preemption. Taco Bell initially raised this argument in a footnote in its opening brief, although it did not explicitly assert preemption as a ground for summary judgment in its motion. Because Taco Bell developed the argument more fully in its reply brief, the Court requested additional briefing from Plaintiffs on the issue.

In its previous opinions regarding Taco Bell's motions to dismiss, the Court held that Plaintiffs' claims met the first prong of the copyright preemption test because they "depend substantially upon works subject to copyright protection." *Wrench I*, 1998 WL 480871, at *4. With regard to the second prong of the test—whether the state law rights asserted by Plaintiffs are equivalent to any of the exclusive rights granted under § 106 of the Copyright Act—the Court held that Plaintiffs' misappropriation, unfair competition, and conversion claims were not preempted because Plaintiffs had alleged the existence of a legal relationship through an implied contract which provided the extra element needed to avoid preemption. *See id.* at *7–9. In its later opinion, the Court refined the scope of its initial ruling to hold that to the extent Plaintiffs alleged an implied in law or quasi-contract, such allegations were coextensive with Plaintiffs' unjust enrichment claim which the Court held to be preempted in its earlier opinion, and therefore could not provide the extra element needed to escape preemption. *See Wrench II*, 36 F.Supp.2d at 790–91. However, the Court held that Plaintiffs' implied in fact contract allegations were sufficient to meet the extra element test because an implied in fact contract requires mutual assent and consideration. *See id.* at 791 n. 2.

Not surprisingly, Plaintiffs argue that the Court should not consider Taco Bell's argument because the Court has already addressed and rejected the argument in its previous opinions. Taco Bell contends that the Court should address the argument because its prior opinions were rendered at the Rule 12(b)(6) stage when the Court was required to accept Plaintiffs' well-pleaded allegations as true. Now, Taco Bell argues, the case is at the summary judgment stage, which puts the issues in a different setting because the parties have had the opportunity to flesh out the contours of Plaintiffs' implied in fact contract allegations and the Court may consider matters outside of the pleadings. While "[q]uestions of federal preemption of state law generally are considered questions of law," *GTE Mobilnet of Ohio v. Johnson*, 111 F.3d 469, 475 (6th Cir.1997), the Court will address the preemption argument because Taco Bell's prior motions to dismiss did not focus specifically on the implied in fact contract claim, the preemption argument presents a question of fact in the sense that the Court must examine the precise nature of Plaintiffs' implied-in-fact contract, and, if Taco Bell is correct, an enormous amount of money, probably millions of dollars, will be spent pursuing and resisting an invalid theory.

■ A state law claim is preempted by the Copyright Act if: (1) the subject matter of the claim falls within the subject matter of copyright; and (2) the rights protected by the state law claim are equivalent to any of the exclusive rights granted by the Copyright Act. *See Del Madera Properties v. Rhodes & Gardner*, 820 F.2d 973, 976–77 (9th Cir.1987), *overruled on other grounds, Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994). In this case, only the second prong of the preemption test is at issue because the Court has previously determined that Plaintiffs' claims fall within the subject matter of copyright.

■ To satisfy the second prong of the copyright preemption analysis, a state law claim must require proof of an extra

17 U.S.C. § 301(a).

element which makes the claim "qualitatively different" from a copyright infringement claim. *See Summit Mach. Tool Mfg. Corp. v. Victor CNC Sys., Inc.,* 7 F.3d 1434, 1440 (9th Cir.1993) (quoting *Balboa Ins. Co. v. Trans Global Equities,* 218 Cal.App.3d 1327, 1342, 267 Cal.Rptr. 787, 796 (1990)).

The statute [ ] requires that a state law create "legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified in section 106" if it is to be preempted.... When a right defined by state law may be abridged by an act which, in and of itself, would infringe one of the exclusive rights, the state law in question must be deemed preempted. Conversely, when a state law violation is predicated upon an act incorporating elements beyond mere reproduction or the like, the rights involved are not equivalent and preemption will not occur.

*Harper & Row Publishers, Inc. v. Nation Enters.,* 723 F.2d 195, 200 (2d Cir.1983) (citations omitted), *rev'd on other grounds,* 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). A state law claim is "qualitatively different" from a copyright claim only where the element changes the nature, rather than the scope, of the action. *See Data Gen. Corp. v. Grumman Sys. Support Corp.,* 36 F.3d 1147, 1164–65 (1st Cir.1994). Exclusive rights granted by copyright law include rights of "reproduction; preparation of derivative works; distribution by sale, rental, lease or lending; public performance, in the case of motion pictures or audiovisual works; and public display of individual images from motion pictures or audiovisual works." *Orson, Inc. v. Miramax Film Corp.,* 174 F.3d 377, 1999 WL 243617, at *10 (3d Cir.1999).

Taco Bell contends that the implied in fact contract in this case, which is essentially that Taco Bell would not use Plaintiffs' ideas and concepts without paying Plaintiffs compensation, is preempted because the rights which Plaintiffs seek to enforce are equivalent to the rights created under the Copyright Act. In support of its argument, Taco Bell relies principally upon the reasoning in *Endemol Entertainment B.V. v. Twentieth Television, Inc.,* 48 U.S.P.Q.2d 1524, 1998 WL 785300 (C.D.Cal.1998). The plaintiff in that case asserted claims for copyright infringement and breach of implied in fact contract based upon allegations that the defendant appropriated the ideas and format of the plaintiff's television show for a similar show which defendants created after engaging in discussions with the plaintiff. The plaintiff alleged that it "was understood ... that Plaintiff would be compensated for any subsequent use of any ideas that might be used." *Endemol,* 48 U.S.P.Q.2d at 1525, 1998 WL 785300. The court found that the alleged promise was insufficient to meet the extra element test, reasoning that:

Plaintiff's breach of implied contract claim falls squarely into the category of contract claims that allege no additional rights other than promising not to benefit from the copyrighted work. Plaintiff's breach of implied contract claim is based on Plaintiff's providing copies of "Forgive Me" to Goodson who "accepted" the benefit of Plaintiff's ideas by "disclosing" and "exploiting" them and "entering into an agreement to develop and produce Plaintiff's ideas and concepts" into a series, thus "interfer[ing] with Plaintiff's ability to exploit and license its television program in the United States." Plaintiff's claim asserts no violation of rights separate from those copyright law was designed to protect and, consequently, is preempted by federal law.

*Id.* at 1528. In reaching its conclusion, the court distinguished two cases cited by the plaintiff, *ProCD, Inc. v. Zeidenberg,* 86 F.3d 1447 (7th Cir.1996), and *National Car Rental System, Inc. v. Computer Associates International, Inc.,* 991 F.2d 426 (8th Cir.1993), which held that the contract claims asserted in those cases were not

preempted, on the basis that those "cases involved *written* contracts that had specific promises that provided an 'extra element' beyond copyright law protections." *Id.* (italics in original).

Other courts have applied the same analysis used by the *Endemol* court in finding both express and implied in fact contracts preempted. In *Tavormina v. Evening Star Productions, Inc.*, 10 F.Supp.2d 729 (S.D.Tex.1998) (mem.op.), the plaintiffs alleged that the defendants breached a contract to pay them for using a photograph of their home to make a replica for a movie and for their time and inconvenience in making their house available to the defendants. The court held that the portion of the plaintiffs' claim which alleged that the defendants breached their contract by not compensating plaintiffs for displaying a copy of their house in the movie was preempted because it was "based upon the same types of allegations that would support a claim of copyright infringement." *Tavormina*, 10 F.Supp.2d at 734. However, the court found that the portion of the claim alleging that the defendants failed to pay the plaintiffs for their time and inconvenience was based on "broader allegations, beyond Defendants' mere copying and display of Plaintiffs' house," and therefore not preempted. *Id.*

In *American Movie Classics Co. v. Turner Entertainment Co.*, 922 F.Supp. 926 (S.D.N.Y.1996) the plaintiff alleged that the defendant breached the terms of an exclusive licensing agreement which provided the plaintiff with the exclusive right to display films. The court found that the exclusivity provision in the licensing agreement did not satisfy the extra element test because the plaintiff would have to show that it had exclusive rights to establish its copyright claim and the breach of contract claim was not qualitatively different from a copyright claim. *See also American Movie Classics*, 922 F.Supp. at 931–32; *see also Wolff v. Institute of Elec. & Elec. Eng'rs, Inc.*, 768 F.Supp. 66, 69 (S.D.N.Y.

1991) (finding breach of contract claim based upon written agreement preempted because claim based on the defendant's use of the plaintiff's photograph was not qualitatively different from copyright action); *Markogianis v. Burger King Corp.*, No. 95 CIV. 4627, 1997 WL 167113, at \*5–6 (S.D.N.Y. Apr. 8, 1997) (concluding that the plaintiffs' claim which "allege[d] that a breach of an implied-in-fact contract occurred when [the defendant] misappropriated" the plaintiff's idea was not "a qualitatively different cause of action than copyright infringement").

Plaintiffs rely, in part, on the Seventh Circuit's decision in *ProCD*, in which the court of appeals reversed the district court's determination that the plaintiff's breach of contract claim based upon a shrinkwrap license was preempted. The court held that "a simple two-party contract is not 'equivalent to any of the exclusive rights within the general scope of copyright,'" based upon the following distinction:

> Copyright law forbids duplication, public performance, and so on, unless the person wishing to copy or perform the work gets permission; silence means a ban on copying. A copyright is a right against the world. Contracts, by contrast, generally affect only their parties; strangers may do as they please, so contracts do not create "exclusive rights."

*ProCD*, 86 F.3d at 1454–55. The court provided several examples of typical contractual arrangements to illustrate its point that copyright preemption could easily subsume private contracts if contractual agreements are equated to exclusive rights granted under the Copyright Act. However, despite its seemingly broad holding, the court stopped short of formulating a per se rule, stating that "we think it prudent to refrain from adopting a rule that anything with the label 'contract' is necessarily outside the preemption clause: the variations and possibilities are too numerous to foresee." *Id.* at 1455.

The court in *Architectronics, Inc. v. Control Systems, Inc.,* 935 F.Supp. 425 (S.D.N.Y.1996), relied on *ProCD* in holding that the plaintiff's breach of contract claim based upon a confidentiality agreement and a software license and development agreement were not preempted. The court criticized the reasoning in *American Movie Classics* that a breach of contract claim that asserts a right granted under copyright law is preempted, and held instead that a promise in a contract creates the extra element that differentiates a breach of contract claim from a copyright claim. *See Architectronics,* 935 F.Supp. at 441.

Plaintiffs also cite the recent case of *Katz Dochrermann & Epstein, Inc. v. Home Box Office,* No. 97 Civ. 7763, 1999 WL 179603, 1999 U.S.Dist. LEXIS 3971 (S.D.N.Y. Mar. 29, 1999), in which the court held that the plaintiff's breach of implied in fact contract claim, based upon the defendant's "promise to pay for the use of the idea alone, regardless of any subsequent rights [the plaintiff] may have acquired under the Copyright Act," was not preempted. *Katz,* 1999 WL 179603, at *4, 1999 U.S.Dist. LEXIS 3971, at *10. The court reasoned that the claim was not preempted because the allegation that the defendant "made an implied promise to pay for [the plaintiff's] idea is entirely separate and apart from any claim for copyright infringement involving literary work." *Id.*

The Court believes the *ProCD* and *Architectronics* cases are distinguishable from this case because they involved written contracts which contained promises that were not equivalent to the exclusive rights granted under the Copyright Act. To the extent that their holdings can be interpreted to apply to implied in fact contracts such as the one in this case, the Court disagrees with their reasoning. Although the *ProCD* court stated that it was "refrain[ing] from adopting a rule that anything with the label 'contract' is necessarily outside the preemption clause," its

holding that "a simple two-party contract is not 'equivalent to any of the exclusive rights within the general scope of copyright'" is not far from an absolute rule against preemption of contract-denominated claims. *ProCD,* 86 F.3d at 1455. As part of its analysis, *ProCD* cited three previous court of appeals decisions which held that the contracts at issue were not preempted: *National Car Rental System, Inc.,* 991 F.2d 426 (8th Cir.1993), *Taquino v. Teledyne Monarch Rubber,* 893 F.2d 1488 (5th Cir.1990), and *Acorn Structures, Inc. v. Swantz,* 846 F.2d 923 (4th Cir.1988). The district court in *ProCD* disagreed with those decisions, but the court of appeals thought them "sound." *ProCD,* 86 F.3d at 1454. The problem with the *ProCD* district court's and court of appeals' treatments of these cases is that each court apparently interpreted them as flatly holding that breach of contract claims are not preempted. However, an examination of each of those cases reveals that the courts did not find that breach of contract claims are categorically not preempted; instead, each court examined the specific contractual rights at issue to determine whether they were equivalent to exclusive rights under the Copyright Act. For example, in *National Car Rental,* the court found that a restriction prohibiting the "processing of data for third parties" was not equivalent to an exclusive right under § 106. *National Car Rental,* 991 F.2d at 433. The *ProCD* courts did not engage in such an analysis.

Professor Nimmer, who is perhaps the leading commentator in the area of copyright law, notes that "contract-based rights themselves are typically not subject to preemption." 1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 1.01[B][1][a] at 1–17 (1977). Yet, he believes that the *ProCD* holding is too broad:

> Having run through the trio of cases that underlay both the district and circuit courts' analysis in ProCD, it thus appears that the rule safeguarding contract causes of action against copyright

pre-emption is less than categorical. Although the vast majority of contract claims will presumably survive scrutiny—as did each of the contract claims confronted in that trio—nonetheless pre-emption should continue to strike down claims that, though denominated "contract," nonetheless complain directly about the reproduction of expressive materials.

*Id.* at § 1.01[B][1][a] at 1–22. For these reasons, the Court finds the *Endemol* rationale to be persuasive. Regardless of whether a claim is denominated breach of implied in law contract (quasi-contract) or breach of implied in fact contract, the conclusion that the claim is preempted by the Copyright Act should be the same if the state law rights asserted are equivalent to the rights granted by the Copyright Act. The Court does not find the *Katz* case cited by Plaintiffs persuasive, either because it is distinguishable from the case at bar or the court reached the wrong result.

 Sometimes implied in fact contracts are preempted, and sometimes implied in fact contracts are not preempted. It depends upon the precise contract right being asserted. In this particular case, this Court concludes that Plaintiffs' claims are preempted because they assert rights that are equivalent to the exclusive rights granted by the Copyright Act and no more. At oral argument, Plaintiffs' counsel stated that the promise which Taco Bell allegedly breached was that "if Taco Bell used Wrench's concepts and ideas, [it] would pay for them." (5/20/99 Hr'g Tr. at 22; *see also* 1st Am.Compl. 44.) The rights Plaintiffs are asserting are equivalent to rights under the Copyright Act because they are based upon Taco Bell's reproduction or use of Plaintiffs' ideas for creation of derivative works. A promise not to use another's ideas and concepts without paying for them "is equivalent to the protection provided by section 106 of the Copyright Act." *Del Madera,* 820 F.2d at 977. Although rights may be created by a promise, whether express or implied,

they do not render a claim for breach of that promise "qualitatively different" if they are infringed by the same conduct prohibited by the Copyright Act. *See Data Gen.,* 36 F.3d at 1165 (stating that a state law claim "is equivalent in substance to a copyright infringement claim where the additional elements merely concern *the extent to which* authors and their licensees can prohibit unauthorized copying by third parties" (italics in original)). Here, Taco Bell's alleged promise not to use Plaintiffs' ideas and concepts does not differ from the Copyright Act's prohibition against preparing derivative works from or displaying copyrighted works.

## III. Independent Creation

 Taco Bell also contends that it is entitled to summary judgment because it has shown that the idea to use a live Chihuahua for Taco Bell advertising was independently created by Williams and Bennett at Chiat/Day. In a case where the plaintiff alleges improper use of his ideas, the "defendant may rebut a prima facie case by showing that it independently created the allegedly misappropriated idea." *Kienzle v. Capital Cities/Am. Broad. Co.,* 774 F.Supp. 432, 436 (E.D.Mich.1991) (mem.op.); *see also Granoff v. Merrill Lynch & Co. .,* 775 F.Supp. 621, 630 (S.D.N.Y.1991).

Taco Bell's proof of independent creation covers two fronts: (1) Taco Bell's Chihuahua was created by another source, namely, Chiat/Day, without knowledge of Plaintiffs' ideas and concepts; and (2) neither Chiat/Day nor the Taco Bell representatives who met with Chiat/Day had access to Plaintiffs' ideas and concepts. With regard to proof of creation by another source, Taco Bell does not dispute that it has the burden of showing that the Chihuahua concept and commercials were independently created by another source. However, the parties disagree about which party has the burden of proof on the issue of access. The cases support both sides.

*Ellis v. Diffie*, 177 F.3d 503 (6th Cir. 1999), addresses access and independent creation in the context of a copyright infringement claim. In *Ellis*, the United States Court of Appeals for the Sixth Circuit reviewed and affirmed findings of fact and conclusions of law made by the district court following a bench trial, in which the district court found that the plaintiff failed to establish copyright infringement. In its discussion, the Sixth Circuit indicated that access is typically an element that a plaintiff is required to prove. The court observed that because direct proof of copying is often difficult to obtain, "frequently the plaintiff will attempt to establish an inference of copying by showing (1) access to the allegedly-infringed work by the defendant(s) and (2) a substantial similarity between the two works at issue." *Ellis*, 177 F.3d at 505. The court also recognized that the degree of proof of access is inversely proportional to the strength of similarity between the two works at issue. *See id.* at 506. Thus, where there are few similarities between the works, stronger proof of access will be required. Conversely, " '[i]f the two works are so strikingly similar as to preclude the possibility of independent creation, "copying" may be proved without a showing of access.' " *Lipton v. Nature Co.*, 71 F.3d 464, 471 (2d Cir.1995) (quoting *Ferguson v. NBC, Inc.*, 584 F.2d 111, 113 (5th Cir.1978)).

In applying the affirmative defense of independent creation outside of the copyright context, courts often consider similarity and access as facets of the defendant's independent creation argument. For example, in *Kienzle*, the court found that the defendants rebutted any inference of misappropriation by establishing both that another person conceived the idea for a television series which the plaintiff claimed was based on his work and that the defendants did not have access to the plaintiff's ideas. *See Kienzle*, 774 F.Supp. at 436, 437 n. 9. In addition, the court considered and rejected the plaintiff's claim that similarity precluded the possibility of independent creation. *See id.* at 437. Similarly, in *Ball v. Hershey Foods Corp.*, 842 F.Supp. 44 (D.Conn.1993), *aff'd* 14 F.3d 591 (2d Cir.1993), the court found that the defense of independent creation could be established "in at least two ways," either by proving lack of access or by showing that the ideas were dissimilar, "thereby precluding an inference that the defendant copied the plaintiff's idea." *Ball*, 842 F.Supp. at 48.

The foregoing cases demonstrate that a plaintiff's proof of access and a defendant's proof of lack of access are really two sides of the same coin. Because a plaintiff must prove access where the two works are not "strikingly similar," and a defendant must establish its defense that it lacked access to the plaintiff's ideas, both parties may be said to have the burden of proof. However, because the issue arises in connection with Taco Bell's motion for summary judgment, the proper focus in this case is whether Taco Bell has established that there is no genuine issue of material fact regarding Chiat/Day's lack of access, or stated otherwise, whether Plaintiffs have come forward with sufficient evidence to show that Chiat/Day had access to Plaintiffs' ideas.

## A. Creation by Chiat/Day

In support of its independent creation defense, Taco Bell has presented evidence that Taco Bell's Chihuahua advertising campaign was conceived by Bennett and Williams of Chiat/Day, without knowledge of Plaintiffs' ideas and concepts for Taco Bell's use of Psycho Chihuahua in its advertising. In deposition testimony and by affidavit, Bennett and Williams provided the details of how and when they conceived the idea to use a Chihuahua in Taco Bell advertising. Specifically, both witnesses testified that their idea to use a Chihuahua came to them one day in May 1997 while taking a break from working on the Taco Bell account to eat lunch, when they observed a Chihuahua trotting down the other side of the street with "no human sort

of contact around him, no master, no owner, just completely a mission . . ." (Bennett Dep. at 203–204.) Bennett and Williams said that they found the dog "pretty funny" and "interesting" and mused that it might be "a great idea if he were after somebody eating Taco Bell." (*Id.* at 204; Williams Dep. at 174.) They took the idea back to their office and began to develop the idea. Within two weeks, Bennett and Williams presented a script or execution for a commercial using the Chihuahua idea, along with scripts for several other ideas, to Taco Bell representatives at a meeting held on June 2. (*See* Williams Decl. ¶ 8, Def's.App. A Ex. 26; A. Truscott Dep. at 51, Def.'s App. B2 Ex. 20; Pls.' App.Ex. 35.) In the Chihuahua script, a male Chihuahua was described as passing up a female Chihuahua in order to get to a person eating Taco Bell food, and then saying to the person, "Yo quiero Taco Bell." Within about a month after the June 2 meeting, Taco Bell ran its first Chihuahua commercial. (See Williams Decl. ¶ 9.)

Bennett and Williams also both deny having any knowledge about Psycho Chihuahua or Plaintiffs' ideas at the time they created their Chihuahua idea. (*See* Bennett Decl. ¶ 4, Def.'s App. A Ex. 3; Williams Decl. ¶ 7, Def.'s App. A Ex. 26.) Moreover, Bennett and Williams state that neither Taco Bell nor anyone else influenced or had input into their idea of using a Chihuahua for Taco Bell advertising. (*See* Bennett Decl. ¶¶ 4, 7; Williams Decl. ¶¶ 7, 12.)

The deposition testimony and declarations of Bennett and Williams are direct evidence that the Taco Bell Chihuahua campaign was independently conceived and developed by Bennett and Williams without any knowledge of Plaintiffs' ideas or Psycho Chihuahua. *Cf. Kienzle,* 774 F.Supp. at 436 (finding the defendant's uncontroverted evidence that the creator of the defendant's television show based her idea on her relationship with several priests and that no one involved in the creation or production of the show knew of the plaintiff's idea). Plaintiffs have failed to offer any direct evidence to rebut Bennett's and Williams' assertions.

Under the circumstances in this case, however, the Court finds that testimony from interested witnesses on the issue of independent creation is, by itself, insufficient to support summary judgment on the defense of independent creation. Such evidence may be sufficient to warrant summary judgment where it shows independent creation prior to the defendant's receipt of the plaintiff's ideas and is corroborated by documentary proof. *See, e.g., McGaughey v. Twentieth Century Fox Film Corp.,* 12 F.3d 62, 64–65 (5th Cir.1994) (finding in copyright case that the defendants could not have infringed the plaintiff's copyright because writer of allegedly infringing script had completed his work prior to the defendant's receipt of the plaintiff's work). In a case such as this, however, where the *possibility* of access exists because the defendant received the plaintiff's ideas prior to the date on which the defendant is able to show independent creation, any evidence regarding access and similarity should be considered in order to determine whether there remains any credible evidence to show improper use of the plaintiff's ideas.

**B. Access**

 Access may be shown where there is a "reasonable possibility" that the defendant had the opportunity to view or copy the plaintiff's work. *See Gaste v. Kaiserman,* 863 F.2d 1061, 1066 (2d Cir.1988). "Establishing a 'bare possibility' of access is not enough." *Moore v. Columbia Pictures Indus., Inc.,* 972 F.2d 939, 942 (8th Cir.1992). "A mere possibility, speculation, or conjecture about access does not satisfy this standard." *Robinson v. New Line Cinema Corp.,* 42 F.Supp.2d 578, 587 (D.Md.1999) (mem.op.).

 In order to create a genuine issue of material fact with regard to access, Plaintiffs must show that someone at Taco Bell with access to their ideas conveyed

those ideas to Chiat/Day. Taco Bell has presented evidence which shows that neither Alfaro, who had direct access to Plaintiffs' materials, nor the persons who worked in his department, transmitted Plaintiffs' materials, other than pictures of Psycho Chihuahua or Psycho Chihuahua figurines, to Chiat/Day. (See 2d Alfaro· Decl. ¶ 12, Def.'s App.A.Ex. 2; Pollak Decl. ¶¶ 11–13; Def.'s App. A Ex. · 18; Richards Decl. ¶¶ 6–8, Def.'s App. A Ex. 19; Nakamura Decl. ¶¶ 7–9, Def.'s App. A Ex. 16.) Taco Bell has also presented evidence which shows that Taco Bell employees outside of the Alfaro group had access only to pictures of the Psycho Chihuahua cartoon dog. (See, e.g., Hill Decl. ¶¶ 4–5, Def.'s App. A Ex. 12; Stack Decl. ¶¶ 5–6, Def.'s App. Ex. 24; Waller Decl. ¶ 4, Def.'s App. A Ex. 25.) Finally, Taco Bell's evidence indicates that no Taco Bell employee suggested to or encouraged Chiat/Day to use Psycho Chihuahua, a dog, an animal, or any other type of character in its advertising. (See Hill Decl. ¶¶ 7–8; Waller Decl. ¶¶ 5–6.)

Despite Taco Bell's evidence, there is circumstantial evidence in the record from which a trier of fact could infer that a Taco Bell employee who had contact with Chiat/Day and Alfaro or a member of his group had the opportunity to receive or view Plaintiffs' ideas through such contact and passed those ideas along to Chiat/Day.[5] For example, over the course of about one year, Alfaro had several opportunities to speak about Psycho Chihuahua with Vada Hill, one of Taco Bell's principal contacts with Chiat/Day. Plaintiffs have shown that Alfaro and Pollak met with Hill on at least one occasion—the December 5, 1996, meeting—to discuss licensing ideas, which included Psycho Chihuahua. In addition, the fact that Alfaro contacted Hill in June 1997 in order to transmit Plaintiffs' drawings and other materials to Chiat/Day also demonstrates a link between Alfaro and Chiat/Day from which it could be reasonably inferred that Plaintiffs' · ideas were passed by Alfaro to Hill and by Hill to Chiat/Day.

## C. Similarity

Plaintiffs argue that their evidence of access is bolstered by the strong similarities between their Psycho Chihuahua ideas and Taco Bell's actual commercials. The Court disagrees with Plaintiffs that there are strong similarities between Psycho Chihuahua, or Plaintiffs' ideas based on Psycho Chihuahua, and Taco Bell's Chihuahua.[6] However, the Court finds that

5. Plaintiffs' proof is based in large part upon the "corporate receipt" doctrine, which provides that an inference of access may arise based on the fact that the plaintiff's materials were received at a corporate defendant's principal offices. See Moore, 972 F.2d at 942; Bevan v. Columbia Broad. Sys., Inc., 329 F.Supp. 601, 609–10 (S.D.N.Y.1971).

6. The Court finds that there are only minor similarities between the storyboards that Plaintiffs furnished to Alfaro and the actual Taco Bell commercials. The storyboards that Plaintiffs sent to Alfaro in September 1996 show a Chihuahua that is physically aggressive and actually steals or grabs Taco Bell food. In one storyboard, two young men are in a jeep vehicle preparing to eat their Taco Bell food when Psycho Chihuahua leaps into the vehicle and grabs their bag. The story ends with Psycho Chihuahua slamming into the vehicle and tearing the roof off. Another storyboard opens with a bag of Taco Bell food being placed in a street and the "Running of the Bulls" in Pamplona, Spain, proceeding towards the bag. The idea is that the bulls are chasing the people and Psycho Chihuahua is chasing the bulls to get to the Taco Bell food. After the crowd and the bulls rush past the bag, Psycho Chihuahua grabs the bag and is gone in a flash. A third storyboard shows Psycho Chihuahua swinging Godzilla around by his tail in order to save Taco Bell. The storyboards that Plaintiffs presented to Alfaro in April 1997 are slightly different from the September 1996 storyboards because Psycho Chihuahua appears less aggressive and is shown with his masters, who try not to let the dog know they have, or are going to get, Taco Bell food.

Taco Bell's commercials are thematically different from Plaintiffs' ideas shown on the storyboards. Taco Bell's Chihuahua is not physically aggressive and does not grab or steal Taco Bell food. The Taco Bell Chihuahua does not have a master. In short, similarity exists only because Plaintiffs and Taco

Plaintiffs' ideas are not so dissimilar to Taco Bell's Chihuahua and commercials as to preclude any possibility of access, especially in light of the circumstantial evidence discussed above. Therefore, the Court finds that Taco Bell is not entitled to summary judgment on its defense of independent creation.

## IV. Novelty

 Taco Bell's final argument in support of its motion is that Plaintiffs' ideas were not novel. In order for Plaintiffs to establish their claims in this case, they must prove that their ideas were novel or original. *See Wrench II*, 36 F.Supp.2d at 790. A plaintiff who seeks to establish novelty "must demonstrate some basis in fact to establish the originality or novelty of its idea." *M.H. Segan Ltd. Partnership v. Hasbro, Inc.*, 924 F.Supp. 512, 524 (S.D.N.Y.1996).

> To establish novelty, a plaintiff's idea "need not reflect the 'flash of genius,' but it must show [ ] genuine novelty and invention, and not a merely clever or useful adaptation of existing knowledge." While even original ideas combine elements that are themselves not novel, novelty cannot be found where the idea consists of nothing more than a variation on a basic theme. In addition, a plaintiff may not claim that an idea is original if it was already in use in the · industry at the time of submission.

*AEB & Assocs. Design Group, Inc. v. Tonka Corp.*, 853 F.Supp. 724, 734 (S.D.N.Y. 1994) (mem.op.) (holding that "Jet Art" toy used for spray painting was similar to designs of other airbrush toys and was "nothing more than a 'clever or useful adaptation of existing knowledge' ") (citations omitted) (alteration in original). An idea that merely incorporates two pre-ex-

isting ideas is not considered novel. *See Kienzle*, 774 F.Supp. at 438 n. 13. A defendant may be entitled to summary judgment on the issue of novelty if "the idea is (i) merely a clever or useful adaptation of existing knowledge; (ii) nothing more than a variation on a basic theme; or (iii) already in use in the industry at the time that the idea was submitted." *Nadel v. Play By Play Toys & Novelties, Inc.*, 34 F.Supp.2d 180, 184 (S.D.N.Y.1999) (granting summary judgment on the basis that the plaintiff's idea for a plush toy with an internal vibration mechanism was already in use in the industry).

 Based upon the evidence in the record, the Court finds that Plaintiffs' ideas were not novel because they merely combined themes and executions that had been used many times in a variety of commercials for different products.[7] For example, one video tape submitted by Taco Bell contains several examples of commercials featuring Chihuahuas, one of which was a commercial for Salsa that played on a Mexican theme. Another video tape contains examples of commercials using bobbing head dolls in cars, which Plaintiffs claim was their idea. Still, another video tape shows various commercials which use specific tag lines identifying the product with the company. The idea of a talking Chihuahua with an attitude is also not new. Two Walt Disney films, "Oliver & Company" and "Lady and the Tramp," feature cartoon Chihuahua characters, both of which are endowed with Spanish accents and "attitudes."

In addition, the characteristics of Plaintiffs' Psycho Chihuahua (even as adapted for Taco Bell's usage) were not unique to Taco Bell's marketing efforts. As part of their similarity argument, Plaintiffs presented the following table comparing char-

Bell both used the same breed of dog—Chihuahua—and Taco Bell food.

7. The Court has reviewed several video tapes submitted by Taco Bell which contain different commercials using a variety of repetitive themes, concepts, and ideas. Like Taco Bell's

Chihuahua commercials, the commercials used bobbing head dolls, talking animals, consistent tag lines, and even the theme of boy passing up girl (or man passing up woman or vice versa) in favor of the product.

acteristics between Psycho Chihuahua and Taco Bell's Chihuahua:

| Psycho Chihuahua | Taco Bell Chihuahua |
| --- | --- |
| Unique | Unique |
| Feisty/has attitude | Has attitude |
| Edgy | Quirky |
| Confident/able to take on any situation | Master of his 'Hood |
| Clever | Clever |
| Funny; humorous | Humorous |
| Cool, strong male | 19 year old trapped in a dog's body |
| Spicy Mexican personality | Lively salsa music |

(Pls.' Br. at 41.)[8] However, as demonstrated by the following table, the characteristics shared by the two dogs are descriptive of the Taco Bell brand:

| 05/16/96 Hakan Proposal | Psycho Chihuahua | Taco Bell Chihuahua |
| --- | --- | --- |
| Innovative | Unique | Unique |
| Attitude | Feisty/has attitude | Has attitude |
| Edgy | Edgy | Quirky |
| Drive | Confident/able to take on any situation | Master of 'Hood |
| Fast; Innovative | Clever | Clever |
| — | Funny; humorous | Humorous |
| Hip; Youthful | Cool, strong male | 19 year old trapped in a dog's body |
| Spicy; Mexican; Southwestern | Spicy Mexican personality | Lively salsa music |

The descriptions set forth in the left hand column, which mimic the descriptions of Psycho Chihuahua and Taco Bell's Chihuahua shown in the previous table, were taken from a May 16, 1996, proposal submitted to Taco Bell by Brian P. Hakan & Associates—currently Taco Bell's licensing agent—in connection with its bid to become Taco Bell's licensing agent. (*See* Def.'s App. D Ex. 10 at BPH1848.) Those terms were used by Brian P. Hakan & Associates to describe Taco Bell's brand "equities." Given that Taco Bell's brand image was established before Plaintiffs' first contact in June 1996 with Alfaro and Taco Bell, Psycho Chihuahua's characteristics (as adapted for Taco Bell's usage) were not novel or unique.

8. The Psycho Chihuahua traits are based on descriptions in marketing boards and other items which Plaintiffs furnished to Alfaro. (*See* Pls.' App. Exs. 7, 8.) The traits of Taco

### Conclusion

For the foregoing reasons, the Court will grant summary judgment to Taco Bell on all of Plaintiffs' claims.

An Order consistent with this Opinion will be entered.

Bell's Chihuahua are based on descriptions contained in Chiat/Day documents. (*See* Pls.' App. Ex. 43.)